STATE

v.

Danny L. BROWN.

No. 95–648–C.A.

Supreme Court of Rhode Island.

March 13, 1998.

Annie Goldberg and Aaron L. Weisman, Providence, for Plaintiff.

Paula Rosin, Providence and Stephen P. Nugent, Barrington, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ., and SHEA, J. (Ret.)

## OPINION

FLANDERS, Justice.

The defendant, Danny L. Brown, appeals from a judgment convicting him on three counts of first-degree sexual assault and three counts of first-degree child molestation sexual assault. The trial justice sentenced him to serve concurrent terms of forty years for each count, with twenty years suspended and twenty years of probation to commence upon his release from incarceration. Because we conclude that none of the Superior Court's challenged rulings constitute error or entitle the defendant to a new trial, we deny and dismiss this appeal for the reasons discussed below.

### Facts and Travel

A grand jury indicted defendant for sexually molesting Emily Doe,[1] his stepdaughter (Emily or complainant). The alleged molestation occurred over an approximately two-and-a-half-year period during which Emily was between the ages of eight and ten years old. On November 30, 1994, after a three-day trial in Superior Court, a jury returned guilty verdicts on all counts. Judgment entered on the verdict and in December 1994

the trial justice denied defendant's motion for a new trial. Sentence was duly imposed on February 14, 1995.

The defendant raised six issues on appeal that he claimed warranted reversal of the Superior Court's judgment. His appeal culminated in a *per curiam* opinion issued on March 5, 1997, wherein a four-justice panel of this court dismissed defendant's appeal on two of the issues he raised while also indicating that the panel was evenly divided on the remaining four claims of error. Accordingly, the trial court's judgment was affirmed. *State v. Brown,* 690 A.2d 1336 (R.I.1997). The defendant immediately moved to reargue his appeal upon the availability of a fifth justice. We granted this request for the limited purpose of reexamining only the four issues that had originally ended in an evenly divided court.

At trial the complainant testified that defendant's sexually abusive conduct toward her commenced during the summer of 1983, just after defendant moved in with her mother, Judy Doe (mother or Doe), Emily, and her sister at the mother's home in West Warwick. According to Emily, defendant initially began to abuse her by fondling her breasts and her vaginal area, but this activity soon escalated to oral sex and finally to intercourse. The defendant's sexual abuse of Emily continued for over two years until November 1985, just before defendant married the complainant's mother, and it typically occurred when the mother was at work or out shopping or when her sister was outside playing, in her room sleeping, or with her mother. Emily testified that the sexual abuse occurred on a regular basis throughout this period.

Emily made no mention of the alleged abuse at the time of its occurrence. The defendant had told her "not to tell anybody. It was our secret." However, in 1989, four years after the assaults ceased, Emily and her mother were watching a television talk show (the "Oprah Winfrey Show") on the subject of the sexual abuse of children. Emily exclaimed to her mother that "that hap-

---

1. The name of the complaining witness and that of her mother have been changed to protect their identities.

pened to me" and subsequently ran out of the room, too "scared" to discuss the matter further. She did not name a perpetrator. Emily's mother testified at trial that when she later confronted defendant with Emily's cryptic exclamation, he denied any knowledge thereof. On cross-examination, however, Emily's mother admitted that in her written witness statement to police she had asserted that defendant had told her that the child had touched him sexually.

Doe and defendant divorced in March 1989. Their marital dissolution was short-lived, however, and after a reconciliation of sorts the couple remarried in June 1991.[2] By the fall of 1991 the Brown family had become regular parishioners of the Living Waters Foursquare Gospel Church in Smithfield. The church's pastor, Elizabeth Janikuak (pastor or Janikuak), who had also officiated at the Browns' second marriage ceremony, began noticing that Emily was "manifest[ing] some real angry behavior." Janikuak called Emily into her office because she "wanted to help her." She assured Emily that she was available to talk about any problems she was experiencing and told her to "call me when she was ready to talk * * * because I wasn't going to force her to talk if she didn't want to." Several days later Janikuak received a call from Emily, and they arranged a meeting on October 24, 1991, wherein Emily revealed to Janikuak her history of having been sexually abused by defendant.

After her meeting with Emily, Janikuak attempted to take immediate control of the situation. She contacted defendant and asked him to come to the church to discuss a "very serious matter." Thereafter, she informed him of Emily's accusations, and defendant denied them. However, he told her that on one occasion several years earlier Emily had approached him while he was asleep on the living-room couch, reached into his underwear, and fondled his penis. The defendant reiterated this version of events at trial. He explained that at first he believed

that it was his wife waking him up but that when he realized it was his stepdaughter's hand in his pants, he scolded her. According to defendant, he informed Doe of this incident shortly after its alleged occurrence, but nothing more was said about it specifically. The mother's recollection contrasted starkly with that of defendant; she testified that defendant never related any such incident to her at that time.

Janikuak subsequently suggested that the Browns seek counseling with Richard Tanguay, M.D. (Dr. Tanguay), a Christian psychiatrist and former pastor located in Wilmington, Connecticut, who had greater experience in counseling than she did. Doctor Tanguay testified that Janikuak had previously referred other persons to him for similar purposes. On December 12, 1991, defendant and Doe traveled to Connecticut to meet with Dr. Tanguay, and there they discussed with him defendant's sexual abuse of Emily. At trial, Dr. Tanguay testified that defendant's reaction "was one of admission, yes, something of a sexual nature did occur between himself and [Emily]" but that defendant was "minimizing" what had happened. Doe testified at trial that at that counseling session Dr. Tanguay asked defendant, "Was there, you know, abuse?" and defendant responded affirmatively, "Two to three times in a month."

Emily still had yet to confide fully in any family member concerning what had happened to her. According to complainant's mother, it was not until April 7, 1992, in the presence of Janikuak, that Emily finally divulged to her mother the extent to which defendant had abused her. On April 30, 1992, Doe reported the information to the police. Thereafter, in June of 1992 formal criminal proceedings began.

On reargument defendant reasserts the four alleged trial errors over which this court was previously deadlocked. He contends that various rulings by the trial justice, to

---

2. The defendant testified that the couple again separated in October of 1991 and that he began a romantic relationship with a friend of Doe's on or about April 12, 1992. According to defendant, within a couple weeks thereafter he told Doe he wanted to file for a second divorce because he "didn't love her" and was in love with Doe's friend. However, Doe apparently was not served with any such divorce complaint until some time on or about July 10, 1992.

which we now turn, violated his confrontation rights under the United States Constitution[3] and the Rhode Island Constitution.[4]

### Analysis

### I

### The Denial of Defendant's Pretrial Motion to Compel the State to Produce the Names and Addresses of Physicians Who May Have Treated or Examined Complainant

The defendant's first claim of error arises from a pretrial hearing on defendant's motion to compel the state to produce the names and addresses of "any and all pediatricians or medical doctors from whom [complainant] may have received treatment or been examined from the period May of 1983 through January of 1987." We believe that the hearing justice was correct in provisionally denying—one year before the trial began—such an overbroad and unripe request for the production of trial witness impeachment material. In any event, because the requested confrontation-clause information was not discoverable as a matter of right before trial, defendant was required to seek this information at the time of trial. However, he neglected to do so, and thereby failed to preserve this issue for review.

A. *The Defendant Was Not Entitled to Obtain the Requested Information during the Pretrial Discovery Phase of this Prosecution*

The defendant's counsel told the Superior Court justice presiding at the November 8, 1993 pretrial hearing that his motion to compel was filed under Rule 16 of the Superior Court Rules of Criminal Procedure. However, as applied to complainant, Rule 16 does not require the state to produce such information as part of pretrial discovery. Other than prior recorded statements or a summary of the witness's expected trial testimony, under Rule 16 "the only records the state is required to produce [pertaining to a pro-

spective prosecution witness] are those regarding prior convictions." *State v. Kelly,* 554 A.2d 632, 635 (R.I.1989) (holding that Rule 16 does not require the state to produce records of the then Department of Children and Their Families pertaining to a prospective prosecution witness).

■ Although the court in *Kelly* went on to hold that the defendant there did have the right to require the state to produce the requested records at trial under the confrontation clauses of the State and the Federal constitutions, it did so not as a matter of pretrial discovery but in the context of what information must be provided to the defendant at trial to enable him to conduct an effective cross-examination of prosecution witnesses. Thus in *Kelly* we noted that "the right of confrontation is a trial right, *raising itself only when a defendant is improperly denied the ability to confront and to effectively cross-examine an adverse witness at trial.*" *Id.* at 635. (Emphasis added.) And it arises only "when the types of questions the defense counsel may ask during cross-examination are improperly restricted." *Id.* Here defendant was never improperly denied the ability to confront and to effectively cross-examine any adverse witnesses against him. Nor were the types of questions that he might wish to ask of any witness improperly restricted. Indeed, the trial justice was never made aware of defendant's desire to obtain the names of all physicians who may have examined complainant for the period requested, and defendant failed to question any witness about such information. Thus, unlike the circumstances in *Kelly,* this was not a case in which a defendant's right to cross-examine and to confront the witnesses against him was impermissibly restricted by the trial justice. Rather, because defendant failed to raise this issue at trial, the trial justice was left totally in the dark on this point and had no reason even to suspect that defendant still desired such information, let alone that he would like the court to compel

---

**3.** The Sixth Amendment to the United States Constitution guarantees that "the accused shall enjoy the right * * * to be confronted with the witnesses against him."

**4.** Article 1, section 10, of our state constitution similarly provides that "[i]n all criminal prosecutions, accused persons shall enjoy the right * * * to be confronted with the witnesses against them."

the state to produce it for his review and use at trial.

In our opinion defendant's request to obtain from the state the names of all physicians who may have treated or examined complainant for a four-and-a-half-year period, coming as it did a year or so before the trial began, was decidedly premature, a fact reflected in the hearing justice's denial of the motion "at this point." [5] If defendant or his counsel had truly desired such information for use at trial before or during cross-examination, it was incumbent on defendant to raise this issue with the trial justice.[6] Although the request, as framed, was improperly overbroad in any event (see below), if defendant had asked the trial justice to require the state to produce any medical records in its possession, custody, or control that would show the results of any vaginal examinations of complainant during the relevant period, the trial justice could have considered whether to require the state to produce any such material so that he could conduct an in-camera inspection for impeachment fodder. *See State v. Kholi,* 672 A.2d 429, 437 (R.I.1996) (endorsing use of in-camera inspection of a complainant's psychotherapy records in a sexual-abuse case). Having failed to make any such request of the trial justice, defendant should not now be heard to raise this issue for the first time on appeal.

Even if defendant had properly raised this issue at trial (which he failed to do) and even if the trial justice had prevented defendant from properly confronting the witnesses against him at trial (which did not happen), the proper remedy here would not be to grant a new trial but to remand this case to the trial justice and direct him to ascertain whether there are or were any such vaginal-examination records in existence and, if so, to determine in camera if the "records would create a basis for an attack on [the] witness's credibility." *Kelly,* 554 A.2d at 636; *see also Kholi,* 672 A.2d at 437. If either one of these questions was answered in the negative, then the alleged error in failing to compel the state to provide this information would be conclusively shown to have been harmless and no new trial would need be granted. Indeed, because defendant made no attempt whatsoever at trial to cross-examine any witness on this issue, to obtain access to the records in question, or to request the trial justice to conduct an in-camera inspection of same, we have no idea that any such records have ever existed, much less that they contain any "basis for an attack on the witness's credibility." *Kelly,* 554 A.2d at 636.

Moreover, although defendant could have utilized Super.R.Crim.P. 17(c)[7] well in advance of any trial, he failed to do so. Pursuant to Rule 17(c), defendant could have requested the court to authorize a subpoena to be served upon Emily and/or her mother (or for that matter upon any of the psychiatric personnel identified in the discovery materials produced in response to the court's order for the state to provide the defense with such information) requiring them to produce for

---

5. The hearing justice did order the state to produce other medical information pertaining to complainant, including information relating to any psychiatric consultations she may have had during a ten-year period. Thus the hearing justice may have determined that, given the confidential nature of the medical information requested, it would be best to proceed in stages in the hope that discovery of the psychiatric records would help to narrow or to obviate the need for irrelevant medical information about other treatments and examinations unrelated to complainant's alleged sexual abuse.

6. The dissent contends that "providing such information after or immediately before trial had begun would have been useless." We disagree. This is the same procedure that the court endorsed in *State v. Kholi,* 672 A.2d 429, 436–37 (R.I.1996) (trial court's order for the state to produce medical records and its subsequent in-camera review are appropriate when a defendant invokes confrontation-clause right to certain records relating to a witness immediately prior to the defendant's cross-examination of that witness); *see also State v. Kelly,* 554 A.2d 632, 636 (R.I.1989) (Department of Children, Youth, and Families records).

7. Rule 17(c) of the Superior Court's Rules of Criminal Procedure provides in pertinent part as follows:

"The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."

the court's in-camera review (and for defense counsel's possible later inspection) any documents (such as doctors' bills, prescriptions, diagnoses, and the like) showing the names of any physicians who might have gynecologically examined or treated Emily during the relevant period. Relying upon an examination of any such records, defendant may have been able to learn the names and addresses of such physicians whose relevant records in turn could have been similarly subpoenaed before trial.

Finally, although every defense lawyer would prefer to maximize the time available to him or her in advance of trial to obtain, to review, and to analyze relevant factual information for possible later use at trial, it goes too far to state that any such information that is not obtained or obtainable until the trial itself is "useless" to a criminal defendant. In such situations we are confident that trial justices can safeguard the defendant's constitutional rights by allowing defendants and their attorneys whatever reasonable time and leeway is needed during the trial itself to evaluate any information that was not reasonably obtainable by them before trial. Indeed, this is precisely the protocol this court endorsed in the above-referenced *Kholi* and *Kelly* decisions, and we discern no reason why it cannot work equally well in this context. After all, the pertinent medical information at issue here—whether complainant had undergone any gynecological examinations during the relevant period and, if so, the results of any such examinations vis-à-vis any indications of sexual activity or abuse—would not appear to be so arcane or technical as to be useless to a cross-examiner if it is produced at or during the trial itself. And any such difficulties that might arise in evaluating such information for its potential trial use, we believe, can be handled by a reasonable continuance of the proceedings to allow the defendant to make full use of whatever information contained therein might be relevant to the defense.

■ Further, we do not believe that the prosecution possesses any special affirmative obligation to assist defendant in his investigation of information sought pursuant to his confrontation-clause rights when such infor-

mation has not been suppressed by the state and when that information is not otherwise in the state's possession, custody, or control. *Cf. State v. Wyche*, 518 A.2d 907, 909 (R.I. 1986) (citing *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)) ("Nor is the prosecution responsible for delivery of information outside [its] custody and control"); *State v. Beaumier*, 480 A.2d 1367, 1371 (R.I.1984), *abrogated on unrelated grounds, State v. Rios*, 702 A.2d 889 (R.I.1997) (no *Brady* violation emanating from "surprise at trial" because defense failed to use already-provided discovery for its own further investigatory purposes); *State v. Pemental*, 434 A.2d 932, 936 (R.I. 1981) (no due-process violation absent suppression of evidence by the state where defendant's allegation was that the state failed to pursue a certain mode of investigation).

Thus in our judgment the motion justice was entirely correct in denying "at this point"—a year before trial—defendant's request for the state to identify all physicians who treated complainant when she was between seven and eleven-and-a-half years old. The request was untimely, was not a proper subject for pretrial discovery, was waived when defendant failed to present it to the trial justice, and was overbroad in any event (see below).

B. *The Request Was Overbroad in Regard to the Period Covered and the Type of Information Requested*

The core confrontation-clause reason for defendant's desire to obtain access to complainant's medical records was to ascertain if she had undergone any vaginal examination by a physician during (or immediately after) the period of the alleged sexual abuse by defendant and, if so, whether any such examination revealed any physical signs of the alleged sexual abuse.

■ However, the request for the names and addresses of all physicians who examined or treated complainant for anything and everything over a four-and-a-half-year period—including any colds, flus, stomach aches, fevers, whooping cough, measles, or any of the other long litany of childhood afflictions unrelated to sexual abuse—was

grossly overbroad in regard both to the period covered (a period that included fourteen months after the alleged abuse stopped) and as to the types of medical treatments and examinations requested. Moreover, because the information sought by defendant about complainant was privileged and confidential health-care information,[8] the Superior Court would have been entirely justified in strictly limiting defendant to only that medical information concerning complainant that was needed for confrontation-clause purposes.

Moreover, wholly apart from the privileged and confidential nature of the information sought, a hearing justice should not have to grant a defendant's informational demands for bushels of chaff if there is any possibility that such a request might turn up a few confrontation-clause kernels at the bottom of the discovery barrel. Nor should the hearing justice have to give defendant a blue pencil, take him by the hand, and then guide him through a redraft of such blunderbuss requests.

Thus even if defendant's discovery request for the names of complainant's examining physicians had been ripe, even if it had been allowable discovery under Rule 16, even if it had been limited to a more appropriate period, and even if it had been presented to the trial justice instead of merely to a hearing justice a year before the trial, it should have been denied because of the manifest over-

breadth in the medical information requested.[9] For all these reasons we conclude that the Superior Court did not err in refusing to grant defendant's pretrial motion to compel the state to produce as part of its pretrial discovery the names of all examining and treating physicians for one of the prosecution's witnesses.

### C. The Adverse Future Consequences of a Contrary Holding

We also seek to avoid the foreseeable legacy of a contrary ruling on this issue. If we were to reverse and rule that the hearing justice should have granted the motion to compel, such a holding would not stop at endorsing the submission of unjustified, overbroad, and unripe requests for confrontation-clause grist when, as here, they have been improperly propounded one year before trial pursuant to Rule 16 discovery. It would also give other defendants every reason to frame and submit such overbroad requests in the hope that, as here, they will be denied well in advance of trial. If so, these defendants and their counsel could then relax and rest assured that they have thereby preserved a surefire issue for appellate review and eventual reversal if any later verdict comes in against them at trial. The fact that they failed to raise this issue with the trial justice would not be held against them on appeal— or so they would argue—because, after all,

---

8. Under this state's Confidentiality of Health Care Information Act, the information requested in the case at bar—the identity of the physicians who may have treated or examined complainant during the requested period—clearly falls within the definition of "confidential health care information" because the request was designed to obtain "information relating to [this] patient's health care history, diagnosis, condition, treatment or evaluation obtained from a health care provider who [may] ha[ve] treated" her. *See* G.L.1956 § 5–37.3–3(3). As such, the requested information, even though it may be subpoenaed pursuant to valid legal process, is presumptively private, confidential, and privileged. *See Washburn v. Rite Aid Corp.*, 695 A.2d 495, 500 (R.I. 1997) (finding that "mere receipt of a valid subpoena does not negate [the] privilege" against unauthorized disclosure of medical records and does not give a party "carte blanche to publish the information willy-nilly to third parties").

9. The dissent states that the law-of-the-case doctrine may have barred any later effort by defen-

dant to revisit his previously denied discovery request. However, the law-of-the-case doctrine is a "flexible rule" such that "[a] clear alteration of the circumstances since the first decision of the question may also make it advisable that the second justice should be permitted to pass upon it in the light of the changed conditions." *Payne v. Superior Court*, 78 R.I. 177, 184, 185, 80 A.2d 159, 163 (1951). Here, given the provisional nature of the hearing justice's ruling, the law-of-the-case doctrine would not have been applicable in any event. If defendant had properly raised this confrontation-clause issue in the appropriate forum (trial) and via an appropriately drawn request (that is, one that was not overbroad) while indicating to the court the results of the earlier court-ordered discovery (names and addresses of those psychiatrists, psychologists, therapists or social workers who provided treatment to complainant), these changed circumstances would have allowed the trial justice to consider defendant's request for confrontation-clause material when it was ripe to do so.

this court does not require bulldog-like tenacity from defendants.

However, we usually do require something more than potted-plant-like passivity for defendants to preserve alleged trial errors for review. What is even worse, however, is that such a ruling would open the door for the type of potential discovery sandbagging described above, an insidious practice that should not be rewarded in this manner.

## II

## The Trial Justice's Limitation of a Prosecution Witness's Bias Cross–Examination

■ The defendant's next claim of error focuses upon the trial justice's limitation of a prosecution witness's cross-examination concerning a lawsuit filed against her by one of defendant's cousins. We conclude that this ruling on the scope of Janikuak's cross-examination fell within the trial justice's broad discretion to limit and control the questioning on such a collateral matter, and in any event was harmless if it constituted an error. The mere fact that the pastor and her church had been sued by an alleged cousin of unknown relational proximity or affinity to defendant for moneys allegedly due on a church construction project does not constitutionally compel a bias cross-examination concerning this collateral subject on pain of reversible error if the same is restricted.

■ We agree that a criminal defendant is constitutionally guaranteed the right to an effective cross-examination of the prosecution's witnesses. *State v. Doctor*, 690 A.2d 321, 327 (R.I.1997); *State v. Anthony*, 422 A.2d 921, 923–24 (R.I.1980). However, the scope of cross-examination is subject to limi-

tation by the trial justice's exercise of his or her sound discretion. *State v. Bowden*, 473 A.2d 275, 279 (R.I.1984). And a trial justice may exercise this discretion to narrow the questioning as long as he or she does not "unduly restrict" a defendant's cross-examination right. *Anthony*, 422 A.2d at 924 (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353–54 (1974)) (noting that the cross-examiner should be given reasonable latitude, including the chance to establish or to reveal bias as it relates to the particular case being tried). Thus, after there has been sufficient cross-examination to satisfy a defendant's constitutional confrontation rights, the trial justice possesses the discretion to limit further cross-examination. *State v. Brennan*, 527 A.2d 654, 657 (R.I.1987). We shall not disturb such a limitation absent a clear abuse of discretion "and then only when such abuse constitutes prejudicial error." *Anthony*, 422 A.2d at 924. Here we conclude that the trial justice's minor restriction on defendant's bias inquiry was neither a clear abuse of discretion nor a prejudicial error necessitating a new trial altogether.

Our review of defendant's proposed line-of-bias inquiry and his subsequent offer of proof at trial reveals that the trial justice did not clearly abuse his discretion in restricting defendant's cross-examination of Janikuak on this point. First, there was no showing whatsoever that the pastor knew that defendant was related to a contractor named Brown or that defendant "was instrumental in putting the people together to build that church." Indeed, according to Janikuak's testimony, she did not even know that a man named Brown had been a contractor who helped to build the church.[10]

10. "Defense Counsel: * * * Did you have a church built in Smithfield?
"Janikuak: Yes, I did.
"Defense Counsel: When was that church built?
"Janikuak: 1991.
"Defense Counsel: By whom was that church built?

"Janikuak: By the people of the church and outside contractors.
* * * * * *
"Defense Counsel: Was there a gentleman by the name of Al Brown who acted in building that church?
"Janikuak: No, he didn't, not. No way.
"Defense Counsel: Al Brown had no contact with that church.
"The Court: You made a statement. Rephrase the question.
"Prosecutor: Objection. May we approach the bench, your Honor?

Second, defendant's subsequent offer of proof was wholly inadequate to indicate that allowing additional cross-examination would have developed probative evidence of bias. *See Doctor,* 690 A.2d at 327–28 (no abuse of discretion in limiting bias cross-examination when witness testified to a lack of knowledge about the subject matter of the alleged bias and the defendant failed to indicate what he might develop if he was allowed to continue his cross-examination). Thus we believe that the trial justice did not err because "a fishing expedition on cross-examination may properly be brought to a halt when it becomes obvious that the pond is devoid of fish." *Id.* at 328 (quoting *Brennan,* 527 A.2d at 657). When Janikuak answered defense counsel's inquiry in the negative about not knowing any man named Brown who had allegedly been involved in building the church, the trial justice was entitled to conclude that "the pond is devoid of fish"—or at least any worth keeping—and defense counsel was obliged "either [to] tell the court where he believed

> "**Defense Counsel:** May we approach, your Honor?
> (The following occurred at side bar out of hearing of the jury.)
> "**Defense Counsel:** I'm going to establish that Danny Brown is a relative of Al Brown.
> "**The Court:** So what?
> "**Defense Counsel:** Al Brown did the backhoe. There were problems. An action was filed on behalf of Al Brown, which I have a certified copy of in my hands.
> "**The Court:** So?
> "**Defense Counsel:** Against her for failure to pay certain costs.
> "**The Court:** So?
> "**Defense Counsel:** Danny Brown, my client, was the party who was instrumental in putting the people together to build that church.
> "**The Court:** So?
> "**Defense Counsel:** It goes to her motive. It goes to her credibility as a witness in this particular case. I also cite *State v. Privitera,* 1 Conn.App. 709, 476 A.2d 605, RI [*sic* ] 1984, in which—Pendency of civil litigation between witness and party against whom he testifies is relevant to bias.
> "**The Court:** I agree. That's good.
> "**Defense Counsel:** I'm seeking to establish for the purpose of her showing lack of credibility.
> "**The Court:** Does your client have an action against this woman?
> "**Defense Counsel:** No, he does not, Judge.
> "**The Court:** Okay. That's it. Let's go.
> (End of side bar conference)
> "**The Court:** Next question please.

the fish were hiding or to pack up his fishing gear and try elsewhere." *Id.* at 328.

■ The defendant cites to a Connecticut intermediate appellate court case, *State v. Privitera,* 1 Conn.App. 709, 476 A.2d 605, 607 (1984), for the proposition that the "pendency of civil litigation between a witness and a party against whom he testifies is relevant to bias." We agree that bias may be inferred in circumstances in which, for example, there is litigation between a prosecution witness and the defendant in that case. However, when as here that litigation is not between a prosecution witness and a defendant but between a prosecution witness and some nonimmediate relation of a defendant involving a matter entirely unrelated to the underlying proceedings, we deem such evidence of alleged bias—especially in light of defense counsel's limited proffer of evidence on the subject—to be too remote to mandate further cross-examination on pain of per se reversal if it is restricted.[11]

> "**Defense Counsel:** Yes, Judge. No further questions."

11. The bias circumstances in the case at bar also do not rise to the level of those in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and therefore do not merit the same level of constitutional protection that was afforded there. In *Davis* the prosecution's witness had a direct and immediate penal interest in testifying against the defendant to protect his probation status as a juvenile offender. Like *Davis* other opinions of the United States Supreme Court indicate that the bias inquiry on cross-examination must bear a direct relationship to the witness's personal penal interest in the case in order to be constitutionally required. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (finding confrontation-clause violation when the trial judge excluded evidence that the witness had agreed to speak to prosecutors about the crime in question in exchange for dismissal of a criminal charge against him). In addition, unlike *Davis,* where the witness was an alleged eyewitness to the actual criminal acts, the witness's testimony here (as we show below) was not " 'a crucial link in the proof * * * of [defendant's] act'." *Davis,* 415 U.S. at 317, 94 S.Ct. at 1111, 39 L.Ed.2d at 354. Moreover, unlike *Davis,* the bias inquiry here stems merely from a nonimmediate familial relationship between defendant and a third party of whom the witness testified she was unaware that he had been a contractor at her church.

Even if we were to conclude that the trial justice committed a clear abuse of discretion by violating defendant's constitutional rights to an effective cross-examination under the Federal and the Rhode Island Constitutions, we believe that there has been no prejudice shown here that would necessitate a new trial. Rather in light of the distinctions between the bias circumstances here and those in *Davis*, the case at bar would not fit the mold for application of the *Davis* court's per se error rule as it was adopted by this court in *State v. DeBarros*, 441 A.2d 549, 552 (R.I. 1982).

Moreover, we conclude that any error here was harmless beyond a reasonable doubt for purposes of the Federal Constitution, *see Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986), and of the Rhode Island Constitution, *see State v. Squillante*, 622 A.2d 474, 480 (R.I.1993), because there was other compelling evidence of defendant's guilt besides the evidence contributed by the pastor. Most tellingly, defendant admitted at trial that his stepdaughter had touched him sexually. Even more damning were defendant's admissions to Dr. Tanguay, in the presence of complainant's mother. At trial the mother testified that defendant told Dr. Tanguay in her presence that he had touched the girl "[t]wo to three times in a month" when Dr. Tanguay pointedly asked him whether there had ever been any sexual abuse. Indeed, defendant conceded on the witness stand that he had been referred to Dr. Tanguay for counseling "because of what happened between me and [Emily]." Moreover, Dr. Tanguay testified that defendant admitted to him that "something of a sexual nature did occur." Even though Dr. Tanguay acknowledged that he could not be very specific in the details of his counseling session with the mother and defendant, he also "was very clear in [his] mind that sexual abuse had taken place, and of a more serious nature than [he] had been led to believe in the beginning." There was no suggestion that Dr. Tanguay had any reason to lie, and his testimony was corroborated not only by complainant and complainant's mother but by Janikuak as well. Unless all these people were liars and unless defendant himself was lying when he made the admissions about the sexual touching that had occurred, then the trial justice's minor restriction of Janikuak's cross-examination—if error it was—was harmless beyond a reasonable doubt.

In any event, defendant was able to testify about Janikuak's alleged bias when he stated that she "told me that she hated me, * * * because I introduced her to my cousin, Hollis Brown, and there's a lot of bickering still going on, and a lot of lawsuits." He also testified about there being "a lot of feuds coming out between my cousin, Al Brown, and Pastor Janikuak, and a lot of the contractors." Thus there was evidence in the record of the pastor's alleged bias toward defendant and/or defendant's cousin, and it does not appear to us that he was in any way materially prejudiced by the relatively minor limitation of the cross-examination on this point.

Finally, defendant also testified to the fact that Janikuak married defendant and his wife some seven or eight months after his cousin's backhoe work at the church had been completed and three months or so after the cousin's notice of intent to claim a lien had been sent to the pastor's church and to the pastor at her Johnston address. Thus it is hard to fathom the materiality of a proposed cross-examination for the purpose of showing the pastor's alleged bias toward defendant when he remained actively involved in the pastor's church and their relationship continued on such apparently good terms that she agreed to and in fact performed his wedding ceremony during the same period in which she was supposed to have been biased against him because a cousin of his was suing the church for nonpayment of a relatively small sum ($3,500) on a church-repair job.

## III

## The Restriction of the Cross–Examination of Complainant's Mother on her Failure to Notify DCYF of the Abuse Allegations

During cross-examination of complainant's mother at trial, the trial justice precluded defense counsel's inquiries into (1) whether and when the mother first notified the De-

partment of Children, Youth, and Families (DCYF) about her daughter's April 7, 1992 disclosures of sexual abuse and (2) whether the mother realized that she had a statutory obligation to notify DCYF of this abuse under G.L. 1956 § 40–11–3. Defense counsel's purported reasoning for this line of inquiry was that the mother's action (or inaction) with respect to DCYF notification would have reflected adversely on her credibility as a witness. According to defendant, because the mother apparently did not make such a notification, she must not have believed complainant's allegations to be true or else she would have notified DCYF to protect her two other children from defendant.[12] Moreover, in a manner consistent with defendant's theory that complainant's allegations were fabrications made at her mother's instigation because he was divorcing her mother for another woman, defendant further contends (for the first time on appeal) that the mother's failure to report the alleged abuse to DCYF despite an awareness of her legal obligation to do so would cast doubt on her assertion that her daughter's allegations had been made before defendant had told the mother he wanted a divorce. However, because defendant failed to make this argument to the trial justice, we hold that he cannot now argue it to this court for the first time on appeal.

■ But even if defendant had made a timely objection on the grounds now proffered, we conclude that the trial court did not violate defendant's state or federal rights to an effective cross-examination by so limiting defendant's cross-examination of the mother. A trial justice has broad discretion in determining the scope of cross-examination, and absent abuse of that discretion we shall not disturb the trial court's ruling. *See State v. Brisson*, 619 A.2d 1099, 1105 (R.I.1993). Here we conclude that there was no such abuse.

In *Brisson*, a case in which the defendant was charged with first-degree sexual assault of his young stepson, this court similarly addressed the propriety of cross-examining a witness on the failure to inform authorities of the alleged abuse. *Id.* at 1105. At trial there, a cousin of the defendant testified that after the abuse allegations were made against the defendant, the stepson told him that he had not been fondled. *Id.* at 1101. We concluded that the trial judge properly allowed cross-examination of the cousin concerning his failure to report this potentially exculpatory information to law enforcement authorities. *Id.* at 1105. Even though we found that there was "nothing inherently erroneous" in cross-examining a defense witness concerning his failure to report potentially exculpatory information to law enforcement authorities, we were also quite clear that our ruling was limited. *Id.* There we emphasized that our position was not to be interpreted as a "broad-based invitation to inquire haphazardly of every witness whether he or she reported information to law enforcement authorities" and that the trial justice "must exercise his or her sound discretion to ensure that the jury is not misled by efforts to impeach the credibility of a witness." *Id.* Thus, to achieve this end, we acknowledged in *Brisson* that a trial justice has broad discretion to limit cross-examination based on a witness's failure to report information to the authorities.

■ We are of the opinion that the trial justice's exclusion of defense counsel's proffered line of questioning in the case at bar did not constitute an abuse of his discretion or impermissibly intrude upon defendant's right to confront witnesses against him. First, it was consistent with our ruling in *Brisson*, which governs any situation (as here) in which a witness is questioned about an alleged failure to notify the authorities and not merely those situations involving cross-examination of defense witnesses. Unlike the situation in *Brisson*, the cross-examiner here sought to put before the jury a

12. Defense counsel contended as much before the trial justice: "Once [the mother] became aware of allegations of abuse, certainly if [she] did not question the veracity of the statements being made by the minor child, [she] certainly would want to protect two other children that would be in the presence of [defendant]. * * * Certainly one [who] would become aware as to a child having been subject to abuse would want to make sure that [her] other children were not subject to the same abuse."

specific statutory provision, thus implying that the witness was in violation of a specific legal obligation to report. The trial justice in this case correctly concluded that defense counsel's doing so might mislead the jury, and thus he properly excluded any questions about whether the witness had reported the abuse to DCYF. As the trial justice stated, the mother is "not on trial here. Her credibility is always an issue, but she's not on trial here." Moreover, defense counsel here provided no foundation that the mother had any knowledge of a duty to report and that, even if she had such knowledge, she would have notified DCYF of her daughter's sexual abuse if she had considered her allegations to have been credible.

Such testimony could also have conveyed to the jury that the mother's failure to report her daughter's abuse to DCYF indicated that even the mother did not believe the daughter's testimony. But this construction would constitute the same kind of negative vouching that we condemned in *State v. Haslam*, 663 A.2d 902, 906–07 (R.I.1995) (testimony by a DCYF investigator that sexual-abuse accusations by the defendant were "unfounded" held to constitute impermissible negative vouching).

We also note the potential existence of significant conflicting considerations that might militate against the mother's providing DCYF with notice in circumstances such as those present in this case. For example, the mother may have preferred to resolve this situation without involving the authorities, especially if she perceived that notification might jeopardize her relationship with her other children. Because these considerations tend to undercut any inference that could be drawn that the mother's failure to report necessarily reflects adversely on her credibility or that of her daughter, we believe the trial justice could properly restrict such a line of inquiry to prevent the jury from being misled on this point. Accordingly we affirm the trial court's exclusionary ruling.

## IV

### The Admission of Alleged Bolstering Testimony

The defendant's final claim of error is that the trial justice supposedly permitted a witness to engage in bolstering. But this contention was not preserved for review because no such objection was specifically raised with the trial justice. In any event the witness's testimony, taken in context, did not constitute impermissible vouching.

### A. *Defendant Failed to Preserve this Issue for Appeal*

According to Rhode Island's well-settled "raise-or-waive" rule, a trial justice's claimed errors that are not specifically objected to at trial—that is, by an objection that is "sufficiently focused so as to call the trial justice's attention to the basis for said objection"—are not preserved for consideration by this court on appeal. *State v. Toole*, 640 A.2d 965, 972 (R.I.1994) (quoting *State v. Warren*, 624 A.2d 841, 842 (R.I.1993)). "[A]llegations of error committed at trial are considered waived if they were not *effectively* raised at trial, despite their articulation at the appellate level." *Toole*, 640 A.2d at 973. (Emphasis added.) Because defendant here failed to raise an effective bolstering objection before the trial justice, this court may not consider this specification of error on appeal.

On direct examination Janikuak testified concerning her discussions with complainant. After she said that she was "very cautious to make sure that what [complainant] was telling me was the truth because we're trained to be sure that just because someone makes an allegation does not mean it's true," defense counsel simply stated, "[O]bjection." The court immediately overruled the objection. However, no grounds were stated either for the objection or for the court's overruling. There was no mention made by defendant of bolstering. Indeed there was no motion to strike the testimony, and the objection itself came too late to be of assistance to defendant. The defendant also failed to request a mistrial or to ask that any cautionary instruction be given to the jury. Thus the trial justice was never apprised that defendant considered the pastor's remarks to constitute bolstering. Accordingly under our established raise-or-waive rule defendant

should not be allowed to pursue this issue on appeal.

In *Toole* a defendant who had been convicted on various counts of sexual assault argued on appeal, among other things, that the prosecutor improperly questioned witnesses to vouch for their truthfulness—on several occasions querying a witness about "the real reason" she had performed a certain act. 640 A.2d at 972. He contended that this questioning was improper because it implied that the prosecutor had some special knowledge regarding the facts of the case. *Id.* The state responded that the defendant did not preserve this issue for appeal because the objection asserted at trial by the defense was a "general rather than a specific" objection. *Id.* This court agreed and concluded that the defendant's objection was "not suffi-

ciently specific or focused for us to review this contention in this particular instance." *Id.* at 973.

In this case not only was defense counsel's objection ineffective because it was not specific, but his colloquy with the trial justice led the latter to conclude that defendant's objection to the pastor's statement was hearsay based. A close review of the trial transcript reveals that defense counsel's proffered objections concerning Janikuak's testimony about her meeting with complainant (wherein complainant first divulged to the pastor that defendant had sexually abused her) were strictly limited to their alleged hearsay status. Indeed the allegedly offending statement itself is sandwiched between bookend hearsay objections.[13]

---

13. "**Prosecutor:** And, what happened at that meeting?

"**Defense Counsel:** Objection.

"**The Court:** Grounds?

"**Defense Counsel:** Your Honor, if there is going to be discussion relative to what [complainant] may have said to her [Janikuak] * * *

"**The Court:** Let's take one question at a time. What's the grounds?

"**Defense Counsel:** It would be that I believe *hearsay* testimony would be elicited.

"**The Court:** That question is what happened at that meeting. *Now, [if] hearsay comes in subsequent to that answer, you can object to it then, not before. I don't want to start it now.* Go ahead. Overruled.

"**Defense Counsel:** Do you recall the question?

"**The Court:** The question is: 'What's [*sic*] happened at that meeting?'

"**Janikuak:** What happened at that meeting is she came in to apologize for her behavior, and I said, 'Well, it seems, I'm really concerned because your behavior seems to be escalating and getting worse.'

"**The Court:** You can't say what she said to you.

"**Janikuak:** Pardon me?

"**The Court:** You cannot say what she said to you.

"**Prosecutor:** Well, if the Court please, I would ask for it. My questions would attempt to elicit the meeting without offering any statements for the truth of the matter asserted but just to explain the meeting.

"**Defense Counsel:** Your Honor, *I renew my objection based on the fact that hearsay testimony is going to be elicited.*

"**The Court:** I understand your apprehension, and if it's elicited, I will deal with it appropriately.

"**Defense Counsel:** Yes, your Honor.

"**Prosecutor:** Did you talk back and forth with her?

"**Janikuak:** Yes, we did.

"**Prosecutor:** Okay. Could you describe what her demeanor was like?

"**Janikuak:** At periods of time she was withdrawn, other periods very angry and antagonistic, just like, leave me alone, you know, like I don't want to talk but yet I'm here, just an up and down behavior.

"**Prosecutor:** Without telling us her words, did she inform you of any incidents that she had been involved in?

"**Defense Counsel:** *Objection, your Honor.*

"**The Court:** Just yes or no.

"**Janikuak:** Yes.

"**Prosecutor:** And—

"**The Court:** Overruled." (Emphases added.)
*Immediately following this colloquy highlighting defense counsel's repeated concern with hearsay testimony came the witness's allegedly offensive bolstering statement:*

"**Prosecutor:** Upon learning this information, what was your reaction? What was your response?

"**Janikuak:** As to what she said to me?

"**Prosecutor:** Yes, without saying what she said.

"**Janikuak:** I was very cautious to make sure that what she was telling me was the truth because we're trained to be sure that just because someone makes an allegation does not mean it's true.

"**Defense Counsel:** Objection, your Honor.

"**The Court:** Overruled."
Just twelve question-answer segments later, defense counsel again renewed his hearsay objection to Janikuak's testimony:

"**Prosecutor:** Again, without giving us any specifics, did you ask her for more specifics or did she give you more specifics?

"**Janikuak:** At that point she was so upset and so distraught I said, '[Emily] you're manifest-

 Although defendant thereby waived any bolstering objection, he also fails to proffer any legitimate exception to the raise-or-waive rule here. A party must satisfy three criteria to qualify for such an exception: "(1) the error complained of must be more than harmless error, (2) the record must be sufficient to permit a determination of the issue, and (3) counsel's failure to raise the issue at trial must be attributed to a novel rule of law that counsel could not reasonably have known during the trial." *State v. Cassey,* 543 A.2d 670, 676 (R.I.1988). Moreover, a defendant's basic constitutional rights must be at issue. *Id.* Because the bolstering argument is hardly a novel rule of law, there can be no colorable claim that this stringent three-part test has been satisfied here.

B. *Pastor Janikuak's Testimony Did Not Constitute Impermissible Bolstering*

 Taking the pastor's statement in the context of her entire testimony, we also believe it is clear that she was not attempting to bolster complainant's credibility, nor would a reasonable jury have so construed her testimony. The balance of what the pastor said demonstrates that she had made no judgment at any point concerning the truth or the falsity of what she had been told by complainant, or for that matter by defendant. Rather she was only attempting to mediate between them to help them resolve this family conflict. Thus in context Janikuak's testimony shows that she was not either endorsing the complaining witness or discrediting defendant. Indeed at one point she stated, "I still was, you know, couldn't see, one was saying yes and one was saying no. I suggested that they see a psychologist."

Hence even if defendant had preserved his bolstering argument for appeal, we are of the opinion that there was no bolstering here because the allegedly offending statement was not an attempt to vouch for the credibili-

ing that behavior again and I don't understand it,' and she proceeded to lash out at me and say, 'Well, if you [*sic*] had happened to you what happened to me, you'd be in the same predicament,' or, 'you would feel the same way.'
"**Defense Counsel:** Objection, your Honor.

ty of another witness within the meaning of *State v. Haslam,* 663 A.2d 902 (R.I.1995), and *State v. Miller,* 679 A.2d 867 (R.I.1996), especially when it is viewed in the overall context of Janikuak's testimony. Moreover, the particular circumstances here are distinguishable from the situations recently presented to us in *Haslam* and *Miller,* where we reached specific conclusions about what type of testimony constitutes impermissible vouching.

We agree that a witness should not be permitted to offer an opinion concerning the truthfulness of the testimony of another witness, and his or her testimony will be inadmissible if it literally addresses credibility or has the same "substantive import." *Miller,* 679 A.2d at 872; *Haslam,* 663 A.2d at 905. However, in order to determine whether the testimony "would be perceived by the jury as a conclusive opinion" on a complainant's credibility, *Haslam,* 663 A.2d at 906, we believe that the reviewing court must consider the offending statements in the context of the witness's overall testimony before the jury.

In the case at bar the testimony preceding Janikuak's alleged bolstering statement addressed the pastor's initial meetings with complainant wherein she first disclosed defendant's sexual abuse. The statement itself concerned the pastor's reaction to the witness's allegations:

"**Prosecutor:** Upon learning this information, what was your reaction?

What was your response?

"**Janikuak:** As to what she said to me?

"**Prosecutor:** Yes, without saying what she said.

"**Janikuak:** I was very cautious to make sure that what she was telling me was the truth because we're trained to be sure that just because someone makes an allegation does not mean it's true."

"**The Court:** There's no question.
"**Defense Counsel:** *Well, again, this is hearsay, your Honor.*
"**The Court:** There's no question. You didn't object to it. You may proceed."
(Emphasis added.)

Although this testimony reveals that the pastor was trying to gauge the truthfulness of complainant's revelations before proceeding further in her counseling, the substantive import of Janikuak's testimony—when viewed in its entire context—was *not* that complainant was being truthful in her allegations. Significantly, a close look at Janikuak's overall testimony on this point reveals that the pastor herself could not determine whether complainant (in her allegations) or defendant (in his denials) was being truthful. And it also highlights the fact that the pastor was merely attempting to mediate this family crisis while moving cautiously in light of the serious nature of the allegations.[14] Accordingly we conclude that Janikuak's overall testimony could not have been reasonably perceived by the jury as vouching for the credibility of complainant's sexual-abuse allegations.

Moreover, this situation is also distinguishable from the testimony we found offensive in *Miller* and *Haslam* for other reasons. In *Miller* the defendant, a college track coach, had been convicted on one count of first-degree sexual assault of one of his student athletes. 679 A.2d at 869. The complainant testified at trial that she had told her mother about the rape. *Id.* at 872. However, a police detective testified for the defendant that she had spoken to the mother several months later and that the mother never brought this fact to the detective's attention. *Id.* On cross-examination the detective was then permitted, over the defendant's objection, to testify that it was "not at all uncommon" for people to neglect to elucidate details of an incident to an investigating police officer fully. *Id.* On appeal the defendant contended that this testimony constituted impermissible vouching for the mother because it purported to explain the inconsistencies between the complainant's trial testimony and the mother's comments to the investigating officer. The defendant argued that this testimony also suggested to the jury that the mother's failure to inform the investigating officer should not have cast any shadow on her credibility. *Id.* We agreed, especially in light of the fact that the evidence was closely balanced and that credibility was therefore of paramount importance. *Id.* at 873.

Unlike the situation in *Miller*, Janikuak's testimony does not purport to explain any testimony that is inconsistent with complainant's sexual-abuse allegations. In addition, unlike *Miller*, where the jury heard extensive

14. "**Prosecutor:** And how did you go about doing that?
"**Janikuak:** I just said to her, "Do you realize the seriousness of your allegations?
"**Prosecutor:** Did you then take any action?
"**Janikuak:** Uh-huh. *I told her that she needed to, you know, continue to look at this aspect of the truthfulness of what she was saying,* and that I would confront Danny Brown with what she said.
"**Prosecutor:** Did you, in fact, do that?
"**Janikuak:** Yes, I did.
"**Prosecutor:** Okay. And how did you go about doing that?
"**Janikuak:** I called Danny Brown on the telephone. I told him that I had a very serious matter that I had to discuss with him, and would he come into my office.
"**Prosecutor:** Did he?
"**Janikuak:** Yes, he did.
"**Prosecutor:** Could you tell us the substance of that discussion?
"**Janikuak:** I related to him the allegations that [complainant] had made concerning him, and he denied it. He denied the allegations.
"**Prosecutor:** When that happened, what did you do next?
"**Janikuak:** *I told him seeing that there is a conflict here, she's saying yes, you did, and he's* saying no, he didn't, I said 'You need to go back to [complainant] and discuss this with her and see what happens at that point.'
"**Prosecutor:** Did you also discuss it with [complainant] again?
"**Janikuak:** Yes, I did.
"**Prosecutor:** Okay. And what happened at your next meeting?
"**Janikuak:** I said to [complainant] that Danny Brown had denied her allegations, and she was completely distraught at that point.
"**Prosecutor:** Can you explain what you mean by that?
"**Janikuak:** She was out of control. I mean, when someone gets upset, it's like when you called someone a liar and maybe, they don't understand it—I don't want to paint words here, but she was out of control. She said, 'He's lying.' *I said, 'Well, somebody's lying here.'*

\* \* \* \* \* \*

"**Prosecutor:** Did you make any suggestions then to Danny Brown?
"**Janikuak:** I said, 'There's something radically wrong here,' because *I still was, you know, couldn't see, one was saying yes and one was saying no. I suggested that they see a psychologist.*" (Emphases added.)

testimony about the lack of evidence to corroborate the sexual-assault charges against the defendant, complainant's word here was not the only evidence supporting defendant's conviction. Indeed, defendant himself admitted to two separate witnesses, and at trial, that acts of a sexual nature did occur between him and complainant. Most significantly, defendant admitted to Dr. Tanguay, in the presence of complainant's mother, that he had sexual activity "two to three times in a month" with complainant. Thus even without Janikuak's testimony the state had substantial other evidence to prove defendant's guilt beyond a reasonable doubt.

In *Haslam* the prosecution—through questioning of a professional sex-abuse-recovery counselor whom the victim had seen periodically for over a two-year period—repeatedly sought to emphasize that the victim had been undergoing therapy with a sexual-abuse counselor as part of her ongoing recovery. 663 A.2d at 904–05. Given that the counselor had no firsthand knowledge of abuse, that she was not a witness to any acts of molestation, and that she obtained her knowledge only via conversations with others, we determined that her repeated references to "sexual abuse recovery" counseling "could only impress upon the jury that [the complainant there] had indeed been sexually abused, just as [the complainant] herself had testified, and that [the counselor] obviously believed that [the complainant] had been sexually abused." *Id.* at 906. Our conclusion was further justified by the fact that the recovery sessions had been ongoing for over two years, including at the time of trial. *Id.*

But here the prosecution did not seek to elicit, nor did the witness offer, testimony that complainant was in counseling with Janikuak as part of some sexual-abuse-recovery program, thus implicitly validating the underlying allegations of sexual abuse. Instead Janikuak's testimony clearly reveals her role as a mere mediator who soon referred the parties on to a psychiatrist (Dr. Tanguay) before whom defendant admitted to his criminal misconduct. Thus, unlike the situation in *Haslam*, the pastor was not a professionally trained sexual-abuse counselor providing treatment to a victim. In fact Janikuak explicitly disavowed that she was "dealing in sexual abuse," testifying that her presence at trial was meant only "to make a statement about what was shared with me."

In *Haslam* we also found the testimony of another prosecution witness to constitute impermissible vouching. There, a child-protective investigator for DCYF was allowed to testify that a complaint lodged by the defendant stating that the complainant's brother had sexually abused the child victim was "unfounded." 663 A.2d at 906–07. We concluded that this declaration had the effect of conveying that witness's belief that the defendant's subsequent testimony on the subject was not to be believed. *Id.* at 907. In contrast, Janikuak's remarks in the case at bar clearly do not rise to the level of the "unfounded" comment by the DCYF investigator in *Haslam*.

Just as a reviewing court should not pick out one isolated statement from a slew of jury instructions without considering all the jury instructions as a whole, *State v. Peguero*, 652 A.2d 972, 974 (R.I.1995), so too should it not pick one isolated statement in a witness's testimony out of context from the whole of it. Here, there is nothing in Janikuak's testimony taken as a whole that expresses any opinion at all about the credibility of either the complainant or the defendant. Finally, having failed to object on the grounds of bolstering, having failed to move to strike the answer that is now targeted on appeal, and having failed to request any cautionary instruction, much less a mistrial, the defendant has not preserved this alleged error for review.

### Conclusion

For these reasons the defendant's appeal is denied and the judgment appealed from is affirmed.

GOLDBERG, J., did not participate.

WEISBERGER, Chief Justice, with whom Justice SHEA (Ret.) joins, dissenting.

In dissenting I respectfully point out that the history of liberty has largely been the history of the observance of procedural safeguards. *McNabb v. United States*, 318 U.S.

332, 347, 63 S.Ct. 608, 616, 87 L.Ed. 819, 827–28 (1943) (Frankfurter, J.). I recognize that the defendant in this case, Danny L. Brown (Brown), was accused of a heinous crime. After conviction he was sentenced to a term of forty years' imprisonment on each of the six counts charged. It is of paramount importance that a person accused of such a crime be afforded all the procedural safeguards that are guaranteed by the State and the Federal Constitutions as well as our procedural rules and case law interpreting these rules.

I believe that defendant was denied procedural safeguards and information that may well have had an important bearing on his ability to prepare a defense. I would hold that three of the four issues raised by defendant warrant reversal. Each of these issues will be discussed in the order in which they are addressed by the majority. Such other facts as are pertinent to the discussion of each issue will be provided.

### Confrontation Clause

All the issues raised by defendant fall within the constitutional guarantees embodied in the confrontation clause of the Sixth Amendment to the United States Constitution made applicable to the states through the due process clause of the Fourteenth Amendment, and its state analogue, article 1, section 10, of the Rhode Island Constitution.

The Sixth Amendment to the United States Constitution guarantees that "the accused shall enjoy the right * * * to be confronted with the witnesses against him." Similarly our Declaration of Rights, article 1, section 10, of the Rhode Island Constitution provides, "In all criminal prosecutions, accused persons shall enjoy the right * * * to be confronted with the witnesses against them."

### Pretrial Discovery Error

Brown's first claim of error arose during the November 8, 1993 pretrial hearing on defendant's motion to compel production of, among other things, "[t]he names and addresses of any and all pediatricians or medical doctors from whom [Emily] may have received treatment or been examined from the period of May of 1983 through January of 1987." The defendant explained his basis for requesting this information as follows:

"Your Honor, the reason for that request, your Honor, is that the alleged acts are to include that of anal intercourse and also sexual penetration. The child is supposed to have been between eight and ten years old at the time of this particular incident. Clearly, there would be medical evidence which would show up through a medical examination. That is the basis for my request * * * relative to the pediatricians."

The hearing justice expressed her belief that defendant's proffer was a "nice request" but denied it nevertheless. Brown asserts that this denial was error. With this contention the dissenting justices agree.

Questions concerning the relevancy of evidence are left to the sound discretion of the trial justice, *State v. Kholi*, 672 A.2d 429 (R.I.1996), who must "foster a search for the truth by giving reasonable latitude to the purpose of cross-examination while preserving a fair and orderly trial." *Id.* at 437 (quoting *State v. Bennett*, 122 R.I. 276, 278, 405 A.2d 1181, 1183 (1979)). That the law entrusts a trial justice with a considerable degree of discretion does not permit him or her to decline to utilize the objective analysis the law commands. *See United States v. Burr*, 25 F. Cas. 30, 35 (C.C.D.Va.1807) (No. 14692D) (Marshall, C.J.) ("[A] motion to [the discretion of the court] is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles").

The majority correctly reiterates the general rule that the confrontation clause is fundamentally a trial right and should not be confused with a "constitutionally compelled rule of pretrial discovery." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct. 989, 999, 94 L.Ed.2d 40, 54 (1987). Yet the principle will compel a state to produce material when the failure to do so would improperly restrict the types of questions defense counsel may ask during cross-examination. *State v. Kelly*, 554 A.2d 632, 635 (R.I.1989). Certainly "[t]he mere possibility [without more] that an item of undisclosed information might have helped the defense * * * does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 353

(1976). Instead a defendant "must at least make some plausible showing of how [the requested material] would have been both material and favorable to his defense." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193, 1202 (1982). The defendant's request in the instant case fell squarely within the parameters of these principles.

The state relies too heavily on the fact that in denying defendant's request, the motion justice's exact words were "I'm not going to grant it [Brown's request] at this point." Apparently the state's argument, unfortunately sanctioned by the court today, is that because the hearing justice left the possibility of discovery open ("at this point"), defendant cannot now complain because he failed to repeat his request at some later date.[15] This implicit assertion that defendant's failure to request again that which had been once denied him constituted waiver of the issue and precludes him from complaining now is without support in law and unpersuasive in concept.

To be sure, a more prudent strategy might have been for defendant to have pressed his discovery requirements at or before trial to a different justice and thus avoid the instant challenge. Counsel for defendant may have decided that it would have been futile to revisit the issue since the factual circumstances had not changed from the time it was first denied by the motion justice. In respect to this possibility I decline to speculate. Presentation of the same motion in the absence of a change of circumstances or an

expansion of the record would probably have been precluded by the law-of-the-case doctrine. *See Payne v. Superior Court,* 78 R.I. 177, 183–85, 80 A.2d 159, 163–64 (1951).[16] I am mindful that the state need not hold an accused's hand in order to ensure that he or she takes advantage of each and every procedural safeguard offered under our legal system. The constitutional guarantees promised in both the Federal and the State Constitutions are, after all, of the negative variety. That is, they forbid the state or federal government from *denying* to the accused that bundle of rights we refer to collectively as "due process." *See DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 195, 109 S.Ct. 998, 1002–04, 103 L.Ed.2d 249, 258–59 (1989) (discussing "negative" quality of substantive due-process rights). The proper provision of those rights lies somewhere between denying outright access to the right and, conversely, holding the state to a duty of affirmatively ensuring that the accused avails him or herself of those protections.[17] Accordingly I decline to hold that defendant waived his right to contest the motion justice's denial, however equivocal, of his reasonable request for discovery.

In *State v. Kelly,* 554 A.2d 632 (R.I.1989), the defendant (Kelly) appealed his conviction of first-degree sexual assault. Kelly claimed that the trial justice's denial of his request to review the victim's Department of Children, Youth and Families (DCYF) records consti-

---

**15.** The state's brief on this issue, as well as the other issues raised by defendant, reveals an apparent dearth of legal precedent to support its position. In fact the state fails to produce any authority whatsoever that arguably supports its position, nor does it argue that the instant facts present an issue of first impression.

**16.** I acknowledge the majority's opinion that the law-of-the-case doctrine would not apply to these circumstances. I respectfully disagree. The majority suggests that the circumstances had changed sufficiently to warrant a revisitation of the issue as the law-of-the-case rule is a "flexible" one. I do not believe, however, that the mere passage of time (nine months in this case, which common experience teaches is a relatively short period in modern litigation practice), without more, amounts to the "clear alteration of the circumstances" upon which the majority relies, such that a reasonably prudent attorney would

feel justified in repetitioning the court. Further, as we point out below, making such a request at trial or on the eve of trial would have required a significant postponement of the case. Such information would have been useless within the framework of the trial itself.

**17.** Although the majority may debate the worthiness of a particular discovery request based on the resemblance of a defendant's demeanor to a bulldog or a potted plant (majority op., part IC), we believe the better reasoned analysis considers the appropriateness of a discovery request in light of the facts and circumstances of each particular case. The question of whether a request falls within some heretofore unannounced litigation timeline obfuscates the issue and avoids the constitutionally compelled inquiry, to wit, whether a defendant is entitled to or not entitled to the information sought.

tuted error. *Id.* at 634. We held that although Kelly had no cognizable entitlement to the records pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure, he did enjoy such a right under both article 1, section 10, of the Rhode Island Constitution and the Sixth Amendment to the United States Constitution. 554 A.2d at 635. We explained that even though the DCYF records at issue were protected from disclosure by statute, G.L.1956 § 42–72–8, when an accused's constitutionally protected right to confront witnesses is in jeopardy, the statute must yield. 554 A.2d at 636. Similarly, in the instant case any confidentiality relating to medical records must yield to the necessity of preparation for trial when the allegations in the indictment place the physical condition of the complaining witness in issue. *See Bartlett v. Danti,* 503 A.2d 515 (R.I. 1986).

I believe that defendant's request was both reasonable and relevant, given the facts as established at the time of the motion justice's denial. Brown sought only the identity of those physicians who may have examined the complainant during the years in question, information that is clearly not subject to protection from disclosure by law.[18] Whether the state had such information in its possession, or any underlying records, is unclear from the record. I can discern, and the motion justice offered, no adequate explanation for denying this request. Defense counsel's stated rationale for desiring this information was more than sufficient to establish its relevancy.

The majority suggests that the right of confrontation arises only upon the commencement of trial. Although this statement may as a general rule have validity, it is scarcely exhaustive. In the case at bar, counsel for defendant sought in a pretrial motion to obtain information concerning the identity of pediatricians or medical doctors who may have treated Emily from May 1983 through January 1987. It is obvious beyond doubt that providing such information after or immediately before trial had begun would

have been useless. Such a request could certainly have led to the discovery of relevant evidence but not without considerable preparation that might include the issuance of subpoenas pursuant to Rule 17(c) of the Superior Court Rules of Criminal Procedure, the interviewing of potential medical witnesses, and/or the taking of depositions pursuant to Rule 15 in the event that one or more medical witnesses might be unable to attend the trial.

This type of preparatory activity would be impossible to accomplish once the trial had begun without requiring an extensive continuance to permit the information to be sifted and placed in such a posture as to be susceptible of use at trial. Consequently the request made well in advance of trial was a prudent act and indeed the only method by which the information, if relevant, could have been utilized at trial.

The confrontation clause must be invoked at a time and in circumstances when its invocation will be meaningful. The information defendant sought was potentially relevant to the critical issue in the case, namely, Emily's credibility as well as that of her mother. There is no doubt that defendant's request was fully ripe when made, a point made clear by defense counsel's proffer, and there was no justification for denying the request or for delaying a decision.

In the event that the motion justice considered the request to be overbroad, she might have modified it to come within the bounds of potential relevance. However, I believe that denying it out of hand deprived defendant of the opportunity to explore a potential source of relevant evidence. It should be noted that defendant never had the burden of proof or persuasion. Evidence that may raise a reasonable doubt in the minds of the jurors can be vital to an effective defense.

The majority suggests the appropriate remedy for such an error would be to remand for a hearing concerning whether the denial of this request for the names of potential witnesses was prejudicial. I would encourage the majority to issue such an order.

---

**18.** Perhaps the majority protests too much. The confidentiality argument raised for the first time by the majority is merely a distraction: Neither the state nor defendant claimed that such information would be entitled to the cloak of confidentiality.

I must note, however, that since I believe that a new trial is warranted in respect to two other issues set forth below, such remand would not accord defendant the full relief to which I believe he is entitled.

### Cross Examination of Pastor Janikuak.

Brown alleges that the trial justice erred in curtailing the cross-examination of Pastor Elizabeth Janikuak (Janikuak). Brown, who has always maintained his innocence, endeavored during the cross-examination of Janikuak to question her regarding the construction of a new church building that was erected in Smithfield, Rhode Island, in 1991. Brown was instrumental in securing the services of several of the construction contractors employed by Janikuak to build the new facility. One of the subcontractors engaged by defendant was his cousin, Al Brown, who performed excavation work on the project. According to defendant's proffer at trial, problems developed during the construction of the church, prompting Al Brown to file a civil suit and to impose a lien against the church, seeking money damages for Janikuak's failure to pay certain costs.

Defense counsel asked Janikuak whether a man named Al Brown had been involved in the construction of the new church facility, to which question Janikuak replied, "No, he didn't. No way." The trial justice refused to allow defendant to pursue this line of questioning, reasoning that because it was Al Brown, not Danny Brown, who had sued the church, the specter of bias was too attenuated to warrant exploration. As a result defendant was unable to probe possible bias harbored against defendant by Janikuak because of the lawsuit and/or defendant's instrumental role in the troublesome project. Moreover, Janikuak's emphatically negative response to the question posed may have proven detrimental to *her* credibility had defendant been able to pursue this line of inquiry and to demonstrate that Janikuak had not been candid about Al Brown's involvement in the construction of the new church.

In addressing defendant's confrontation argument, we feel that it is important to be mindful of the small universe of witnesses and their respective testimony in this case.

Janikuak, though not involved with either the Browns or the Does during the period of the alleged sexual abuse, evolved into a central, if not *the* crucial, witness for the prosecution. If the trial testimony of Brown and Emily cancel each other out (and there is no dispute that there were no eyewitnesses to the alleged abuse) then Janikuak becomes pivotal to the jury's understanding of the facts and the jury's reconciliation of the discrepancies embedded in the testimony of the other principals. After all, it was Janikuak, a purportedly disinterested witness, who, (1) corroborated the most crucial testimony of both of the state's primary witnesses, Emily and Doe, (2) was the original recipient of Emily's trust, and (3) testified that Brown had acknowledged some contact between Emily and himself.

A defendant's right to cross-examine the state's witnesses is a "primary interest" secured by the confrontation clause under both the Federal and the State Constitutions. *State v. Freeman,* 473 A.2d 1149, 1153 (R.I. 1984) (quoting *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974)). The United States Supreme Court has characterized this right as follows:

> "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his [or her] testimony.' * * * [T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis,* 415 U.S. at 316–17, 94 S.Ct. at 1110, 39 L.Ed.2d at 354.

We have liberally construed the mandate of *Davis* in a manner consistent with our belief that "[t]he right of confrontation * * * [requires] that a jury be allowed to evaluate *any* motive that a witness may have for testifying." *State v. Olsen,* 610 A.2d 1099, 1102 (R.I.1992) (quoting *State v. Beaumier,* 480 A.2d 1367, 1372 (R.I.1984)). (Emphasis added.) Because the very nature of cross-examination is "necessarily exploratory," "[c]ounsel often cannot know in advance what pertinent facts may be elicited." *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624, 628 (1931).

Cross-examination has been described as the "greatest legal engine ever invented for the discovery of truth." 5 J. Wigmore, *Evidence* § 1367 at 32 (Chadbourn rev. 1974). Without a doubt an important component of this engine is the opportunity to impeach a witness by showing "that a witness has bias or prejudice toward one of the parties or has a personal interest in the outcome of the case which can be expected to color his [or her] testimony and undermine its reliability." *In re Douglas L.*, 625 A.2d 1357, 1360 (R.I.1993) (quoting *State v. Eckhart*, 117 R.I. 431, 435, 367 A.2d 1073, 1075 (1977)). "[T]he scope of cross-examination, even for the purpose of exposing bias, is not unlimited," *State v. Doctor*, 690 A.2d 321, 327 (R.I.1997) (quoting *State v. Veluzat*, 578 A.2d 93, 95 (R.I.1990)), but, instead is left to the sound discretion of the trial justice. *State v. Benevides*, 420 A.2d 65, 69 (R.I.1980). Nonetheless, the right itself may not be given or withheld at the pleasure of the trial justice. *State v. DeBarros*, 441 A.2d 549, 552 (R.I.1982). "[The] discretionary authority to limit cross-examination comes into play [only] after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." *Id.* (quoting *Springer v. United States*, 388 A.2d 846, 855 (D.C.App. 1978)). We have previously declared that cross-examination sufficient to satisfy the constitutional guarantee requires the trial justice to afford the accused "reasonable latitude * * * to establish or reveal possible bias, prejudice, or ulterior motives as they may relate to the case being tried." *Doctor*, 690 A.2d at 327 (quoting *State v. Anthony*, 422 A.2d 921, 924 (R.I.1980); *see Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297, 309 (1973) (quoting *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508, 510 (1969)), and explaining that denial or significant diminution of cross-examination "calls into question the ultimate 'integrity of the fact-finding process' ").

Applying these time-tested principles to the instant case leads inevitably to the conclusion that Brown's constitutionally protected interest in confronting adverse witnesses was thwarted by the trial justice's premature intervention at the behest of the prosecution. First, in respect to Janikuak's credibility, had defendant been able to confront her with documentary evidence that Al Brown had in fact been associated with the construction project, it may have cast a less hospitable light on the totality of her severely damaging testimony. Second, it is beyond debate that the pendency of civil litigation between a witness and a party is relevant to show bias. *DeBarros*, 441 A.2d at 551–52; *Commonwealth v. Maffei*, 19 Mass.App.Ct. 924, 471 N.E.2d 1364, 1365 (1984).

Although Brown himself was not a named party to the civil action, the fact that he was instrumental in assembling the construction team and was related to plaintiff who was suing Janikuak and her church merited at least some opportunity to probe the issue. *See, e.g., Spoerri v. State*, 561 So.2d 604, 606 (Fla.Dist.Ct.App.1990) (reversing child-sexual-assault conviction when the defendant was restricted in cross-examining victim's mother who was being evicted by her landlord, the defendant's employer). The trial justice's dismissal of defense counsel's proffer without such an opportunity denied Brown this proper avenue of questioning.[19]

The majority suggests that counsel for the defense did not present to the trial justice an adequate basis to pursue his cross-examination in respect to bias. Indeed, the majority cites *State v. Brennan*, 527 A.2d at 654, 657 (R.I.1987), for the proposition that "a fishing expedition on cross-examination may properly be brought to a halt when it becomes obvious that the pond is devoid of fish." I must respectfully but vehemently disagree with the notion that there was any indication that this pond was "devoid of fish." The only question that defense counsel was permitted to ask was whether Al Brown had "acted in building" Janikuak's church. After an em-

---

**19.** In *Calci v. Brown*, 95 R.I. 216, 220, 186 A.2d 234, 236 (1962), this court held that a trial court may not properly require offers of proof concerning inquiries made for purposes of cross-examination except in extraordinary circumstances.

The offer of proof at issue here was more than adequate to indicate that the subject matter was germane to the issue of bias. *See State v. Doctor*, 690 A.2d 321, 331–32 (R.I.1997) (Weisberger, C.J., concurring).

phatically negative response to this question, defense counsel was precluded from further questioning even though he set forth in some detail, as quoted in the majority opinion, his reasons for exploring Janikuak's potential bias. Thus in this case I cannot discern whether there were fish in the pond because defendant was not even permitted to cast his line. The fact that defendant was allowed to testify concerning the role of his cousin and the relationship between the cousin and Janikuak is no substitute for effective cross-examination of Janikuak on this issue.

Denial of an accused's right to cross-examine witnesses against him is subject to *Chapman* harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674, 686 (1986); *accord Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967). Thus in order for this court to dismiss the trial justice's error as harmless, we must conclude that "assuming * * * the damaging potential of the cross-examination were fully realized," that error in precluding such examination was harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 686; *see State v. Squillante*, 622 A.2d 474, 479 (R.I. 1993) (applying *Van Arsdall* factors to alleged denial of confrontation claim); *State v. Manocchio*, 523 A.2d 872, 874–75 (R.I.1987).

Writing for the Court in *Van Arsdall*, then-Associate Justice Rehnquist enumerated factors a reviewing court could consider in determining the magnitude of the error: (1) "the importance of the witness' testimony in the prosecution's case," (2) "whether the testimony was cumulative," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," (4) "the extent of cross-examination otherwise permitted, and" (5) "the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 686–87.

Application of the above criteria to the curtailment of Brown's opportunity to cross-examine Janikuak weighs against declaring the error harmless beyond a reasonable doubt. Janikuak's testimony, and her credibility, were undeniably at the forefront of the jury's determination of defendant's guilt or innocence. The state's ability to bear its burden of proof was borne in no small part thanks to the damaging testimony of Janikuak. Her testimony was not duplicative or cumulative, nor was there corroborating evidence of her testimony save that of Doe. The majority's rendition of this evidence could lead a reasonable reader to conclude that Danny Brown testified to the admission of sexual abuse. This was not the case. The defendant testified, just as he had related his version of events previously, that the only physical contact he had had with Emily was the innocent contact that she initiated. As indicated by the majority, *see* majority op., part II, the "two to three times" testimony came solely out of the mouth of Emily's mother, Judy Doe, who claimed that defendant made such an admission to Dr. Richard Tanguay. It is critical, however, to note that nowhere in the vague testimony of the doctor was there any mention of such an admission by defendant. Indeed a reading of Dr. Tanguay's testimony clearly indicates that he had virtually no specific recollection of any admission by Danny Brown. The bulk of his testimony related to his experience with sexual-abuse cases in general rather than the case concerning which he purported to testify. Pastor Janikuak, then, was presented to the jury as a seemingly disinterested witness who did not fit defendant's theory that Emily and Doe had concocted the allegations as retribution for Brown's extramarital assignations and divorce of Doe. Consequently the trial justice's restriction of this topic of cross-examination completely deprived Brown of his most persuasive basis for attacking this witness.

One can only speculate about the limitless possibilities the impact of Janikuak's alleged bias may have had on the jury or its findings concerning defendant's fate. The burden placed upon the state to prove each element of the crime beyond a reasonable doubt renders evidence of potential bias extremely significant since reasonable doubt may well be based upon the impeachment of the credibility of an important witness. Because "[a] reasonable jury might have received a significantly different impression of [Janikuak's]

credibility had [Brown's] counsel been permitted to pursue his proposed line of cross-examination," *see Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1436, 89 L.Ed.2d at 684, I believe defendant is entitled to a new trial.

### Bolstering Testimony of Pastor Janikuak

Brown's next claim of error concerns Janikuak's testimony regarding her meeting with Emily in which Emily first divulged that her stepfather, Brown, had sexually abused her. In particular, defendant objects to the following:

"[Prosecutor]: Without telling us her words, did she inform you of any incidents that she had been involved in?

"[Defense Counsel]: Objection, your Honor.

"[The Court]: Just yes or no.

"[Janikuak]: Yes.

"[Prosecutor]: And—

"[The Court]: Overruled.

"[Prosecutor]: Upon learning this information, what was your reaction? What was your response?

"[Janikuak]: As to what she said to me?

"[Prosecutor]: Yes, without saying what she said.

"[Janikuak]: *I was very cautious to make sure that what she was telling me was the truth because we're trained to be sure that just because someone makes an allegation does not mean it's true.*

"[Defense Counsel]: Objection, your Honor.

"[The Court]: Overruled.

"[Prosecutor]: And how did you go about doing that?

"[Janikuak]: I just said to her, 'Do you realize the seriousness of your allegations?'

"[Prosecutor]: *Did you then take any action?*

"[Janikuak]: Uh-huh. I told her that she needed to, you know, continue to look at this aspect of the truthfulness of what she was saying, and that I would confront Danny Brown with what she said." (Emphasis added.)

Later in her testimony Janikuak recalled defendant's telling her of his claim that it was Emily who had inappropriately touched him.

"[Prosecutor]: What was your reaction to his saying this?

"[Janikuak]: I was shocked because I'm the mother of four children, and I can't, if my children were to come to me and say that about their father, I mean, I would be appalled that my husband would tell me that my child of eight years old was the perpetrator. He's 26 or 28.

"[Prosecutor]: What did you say to him?

"[Janikuak]: I said, 'I can't believe a 26 or 28 year old man would say that an eight year old child was the perpetrator.'"

The determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury. *State v. James,* 557 A.2d 471, 473 (R.I.1989). Accordingly it is impermissible for a witness to offer an opinion concerning the veracity of another's testimony. *Id.* Even when one witness does not literally state his or her opinion concerning the credibility of another witness, if the challenged testimony would have the same substantive effect, the testimony is inadmissible. *State v. Haslam,* 663 A.2d 902, 905 (R.I.1995). Such bolstering of a witness's credibility, especially crucial when it is the complaining witness's testimony that is being buttressed, invades the exclusive territory of the factfinder. *Id.* at 905–06. Moreover, so-called bolstering testimony offered by one held in high esteem in the community may particularly influence the jury. *See, e.g., State v. Desmarais,* 479 A.2d 745, 748 (R.I. 1984); *State v. Nicoletti,* 471 A.2d 613, 617 (R.I.1984) (acknowledging influential nature of police testimony); *State v. Castore,* 435 A.2d 321, 326 (R.I.1981) (recognizing that a doctor's testimony would be accorded great weight by factfinder).

Allowing such testimony, or failing to admonish the jury to disregard it, creates a substantial risk that a defendant faced with such testimony will be deprived of a jury's judgment on all those issues that the law commits to its determination. The risk is that the jurors might reasonably defer to the judgment of one with purportedly "actual" knowledge rather than rely solely on their

collective determination, restricted as it may necessarily be by the sometimes cloistering effect of our evidentiary rules. The trial justice's error in failing to take steps to equalize the impermissible impact of Janikuak's vouching effectively allowed Janikuak to evaluate credibility, "and, in effect, to sit in the jury box and become the thirteenth juror." *Castore*, 435 A.2d at 326.

The majority suggests that if consideration is given to the entirety of Janikuak's testimony it becomes clear that she never actually decided for herself who was telling the truth. What is important, however, is not what Janikuak's subjective conclusions may have been but rather what the *jury* might have reasonably concluded on the basis of the words spoken. Here it is clear that the bell was rung early in her testimony. First, she informed the jury of her acuity in divining truth. This was later compounded when she testified to telling defendant that she was "shocked" and "appalled" by his explanation of events and could not believe any man his age would tender such an excuse. Nothing about which Janikuak subsequently testified was sufficient to dilute this powerful vouching or erase it from the jury's consideration.

With unerring twenty-twenty hindsight, the majority faults defense counsel for failing to make crystal clear to the trial justice that this objection rested upon the principle of bolstering. However, the very nature of Janikuak's statement immediately preceding the objection made this issue so obvious that further clarification to the trial justice was scarcely required. It is further true, as the majority indicates, that a motion to strike would have been more appropriate than an objection. Such puristic analysis, though not without merit, may often be lost in the press of trial. A defendant's right should not hang on such subtle distinctions. The majority bolsters its argument that defendant is not entitled to our review of this claim by pointing out that he failed to request a cautionary instruction after the trial justice had overruled his objection to the vouching testimony. This again grinds too fine a point; as we have explained in other similar circumstances, when such a request would be futile, as here, we have refrained from requiring

such a request from a criminal defendant before according him or her access to meaningful appellate review. *See, e.g., State v. Mead*, 544 A.2d 1146, 1150 (R.I.1988).

In *Haslam* we vacated the defendant's Superior Court conviction on various charges of child molestation in part because the trial justice had permitted the testimony of a sexual-abuse-recovery counselor (Swink) who treated the victim following the alleged abuse. The testimony elicited repeatedly alluded to the fact that Swink's primary area of practice was sexual-abuse recovery. *Haslam*, 663 A.2d at 905. Also, the state elicited over defense objection that sexual-abuse recovery was indeed the purpose of the victim's meetings with Swink. *Id.* at 904–05. We held that testimony to be prejudicial to the defendant; Swink had neither firsthand knowledge of the alleged molestation nor any opportunity to witness any interaction between the accused and the victim. *Id.* at 906. The repeated references to sexual-abuse recovery, coupled with the testimony that counseling sessions between Swink and the victim had been ongoing for more than two years, could have led the jury logically to conclude that Swink obviously believed the victim's allegation to be true. *Id.* Finally, we concluded that owing to the fact that the credibility, or lack thereof, was a crucial or even a paramount issue in the case, the allowance of Swink's vouching testimony was reversible error. *Id.* at 906; *see also State v. Miller*, 679 A.2d 867, 873 (R.I.1996) (finding prejudicial error in a situation in which police officer's vouching testimony was admitted in case where "the quantity and the quality of the evidence were closely balanced and credibility was of paramount importance").

Applying the clear principles of *Haslam* to the instant appeal compels a like result. In neither case did the vouching nature of the testimony evolve into an outright endorsement of the victim's veracity, but in both cases the effect was the same. Here as in *Haslam* the bolstering testimony came from a witness who would ordinarily enjoy a position of trust in the community. Here as in *Haslam* the jury could have been led to believe that the witness somehow possessed special talents for the discernment of truth:

(1) in *Haslam* the prejudicial testimony came from a professionally trained expert who dealt primarily with victims of sexual abuse and, therefore, would be proficient in determining whether someone had suffered from such trauma, (2) in the case at bar Pastor Janikuak testified that she had particular professional sensitivity to sexual abuse and training in assessing truth. Finally, in this case as in *Haslam* the veracity of the complaining witness was of paramount importance. Emily's word stood alone as the state's only evidence since there was no forensic evidence and, as is generally the case, no witnesses to, or in corroboration of, the child's claims.

### Conclusion

The pretrial and trial errors discussed above undermine confidence that the defendant's conviction was the product of a constitutionally fair process. The constitutional protections afforded under the right of confrontation embody deeply entrenched beliefs that are central to our system of jurisprudence. Ours is, after all, an accusatorial system, not an inquisitorial one. These constitutional imperatives reflect our societal belief in procedures that ensure one who is accused of a crime, however heinous, a fair trial and a reasonable opportunity to defend against the prosecution's evidence. The defendant received neither. For these reasons I respectfully dissent.